## HOWARD *et al. v.* McDiarmid.

MANDAMUS—*When will lie.*—It is a general rule that where a person has a legal right to insist that a certain act shall be done, the performance of which is, by law, made the duty of a public officer, mandamus will lie.

ELECTION RETURNS—*Duty of County Clerk.*—It is the duty of the county clerk to make out and return to the office of secretary of State, an abstract, of the whole number of votes cast at an election, according to the returns on file, in the clerk's office, for each candidate.

The clerk cannot decide the legality, nor can he question the validity of the appointment of judges.

Regularity is to be presumed in favor of the returns of elections by judges appointed in the manner prescribed by law, and if there be a question respecting the regularity, the clerk has no authority to decide it.

SENATORIAL AND REPRESENTATIVE DISTRICTS.—The provisions of the Constitution, regulating the apportionment of Representative and Senatorial districts, does not inhibit the Legislature from passing an act, changing county boundaries.

### *Petition for Mandamus.*

*Garland & Nash, English, Gantt & English, Watkins & Rose* and *Warwick,* for petitioners.

*Rice & Benjamin, Yonley, Gantt* and *Montgomery,* for respondent.

McCLURE, J.

The plaintiffs filed their petition, praying for a *mandamus,* against McDiarmid, the county clerk of Pulaski county, to compel him to certify certain election returns, to the secretary of State.

The petition, in substance, recites that the petitioners were candidates for election to the House of Representatives, and that an election was held in said county, for that purpose, on the eighth of November, 1870; that the board of registration, immediately before said election, appointed judges of election, in the manner prescribed by law; that a copy of the appoint-

ments, thus made, was filed in the office of the county clerk of said county, and became a record in that office; that in the townships of Ashley, Eastman, Campbell, Gray and Badgett, armed mobs seized and usurped the places, designated as voting places, and prevented the judges, regularly appointed, from holding the election, and appointed others in their stead, and held a pretended election, the returns of which were forwarded to said McDiarmid; that in the township of Eagle, and the first and third wards of the city of Little Rock, the judges appointed as aforesaid, by the board of registration, held an election and duly certified the returns of the same to said McDiarmid, county clerk, who has utterly disregarded his duty and refuses to certify the same to the secretary of State, as by law he is required to do.

The relief asked for, is that this writ, by *mandamus*, compel the said McDiarmid, county clerk, etc., to certify to the secretary of State, abstracts and statements of the votes, cast at said election, for representatives to the House of Representatives of the General Assembly, from the township of Eagle and the first and third wards of the city of Little Rock, by the judges of election constituted and appointed by the board of registration as aforesaid, as well as other returns, or pretended returns, of such election presented to him, or on file in his office.

McDiarmid filed a response to the petition, in which he declares that he, before the filing of the petition, did make out abstracts and statements of the votes cast at said election to the House of Representatives, etc., held on the 8th day of November, from the township of Eagle, and the first and third wards of the city of Little Rock, held by the persons appointed judges of election by the board of registration, to the secretary of the State of Arkansas, and that before the filing of the petition against him, he had made abstracts and statements of all returns, or pretended returns, of such election, presented to or filed in his office, and returned and certified the same to the secretary of State, and asks that he may be dismissed.

Thereupon the plaintiffs filed a supplemental petition, wherein it is set up that said McDiarmid, in the pretended returns made by him, as charged in his answer, did not in any manner comply with the law, but on the contrary violated the same in many respects.

*First.* That said returns, so made by said McDiarmid to the secretary of State, show that in the first and third wards of the city of Little Rock, and in the township of Eagle, in said county, there were double elections, or elections by two sets of judges, or persons claiming to be judges, and that said returns fail to show which were the regular and legal elections in said wards and township, etc.

*Second.* That said returns make no showing at all as to the *persons* claiming to have held elections being the regular and legal judges, when said clerk knew who, in fact, were such legal and regular judges, and this was and is an important matter to be placed before the secretary of State, etc.

*Third.* That said returns inform the secretary of State that the townships of Caroline, Clear Lake, Richwoods and Prairie are, and were at the time of the election aforesaid, a portion of the twelfth Senatorial and Representative district, and not a portion of the tenth district, and therefore failed to show that the elections held in said townships were estimated and counted in the elections of said tenth district; when, in fact, the elections held in said townships should be counted and estimated in the returns of the said tenth district.

*Fourth.* That if said McDiarmid will make out and certify the returns of such election *as he should do*, and in conformity with the specifications contained in said original petition, and this amendment, and in accordance with the law, that it will furnish the petitioners with the means of securing the places to which they have been legally elected, without which they will be deprived of their places as aforesaid, and the secretary of State will not be able to issue certificates of election to the proper persons.

The amended petition concludes with a prayer, asking that

"the said McDiarmid be ordered and directed to make out and certify said election returns as hereinbefore indicated, and that, to that end, a writ of *mandamus* issue from this court, etc.

To the amended petition, McDiarmid filed a response to the original and amended petition, and says that the same is not sufficient in law, and he demurs to the same: *First.* Because the court has no jurisdiction to hear and determine the matters therein complained of and set forth. *Second.* Because the petition does not set forth facts sufficient to entitle petitioners to the relief asked, or to any other relief.

The demurrer raises no question as to the jurisdiction of this court in cases of *mandamus* generally, but that, in this particular case, it has no jurisdiction. If this be true, the application for *mandamus* will be dismissed. It is laid down as a general rule, by all text writers, that *mandamus* will lie "where a person has a legal right to insist that a certain act shall be done, the performance of which is, by law, made the duty of a public officer." *Moses on Mandamus, 16.*

The first question to determine is, whether the petitioners "have a legal right to insist" that the election returns shall be certified to the secretary of State.

The second question is, whether that act, insisted on, is one, the performance of which is required by law."

And the third is, whether McDiarmid is a "public officer."

We will take up the propositions in just the reverse order of their statement. We will assume that the county clerk is a "public officer," and this assumption disposes of any argument on the third point, and turn our attention to the second proposition, which is, "Is it the duty of the clerk to make out and certify to the secretary of State, an abstract of the votes cast, for candidates voted for, at the general election, in November last, for members of the House of Representatives of the General Assembly of the State of Arkansas?" The answer to this question must be determined by the provisions of the law alone.

Section 39 of the election law says: "On the fifth day after the

election, if all the returns have been received, the clerk of the county court shall proceed to open and compare the several election returns which have been made to his office, and make abstracts of the votes given for the several candidates for each office, on separate sheets of paper; and such abstracts, being signed by the clerk, shall be deposited in the office of the clerk of the county court, there to remain." This section requires an abstract to be made out.

' The 42d section of the same act says: "Each clerk of the county court shall, within two days after the comparison and examination of the returns of any election, deposit in the nearest post office, on the most direct route to the seat of government, certified copies of the abstracts, filed in his office, of the returns of the election of all executive, judicial and legislative officers," etc.

These sections clearly make it the duty of the county clerk to make out and return to the office of the secretary of State certified copies of the returns of the election of all executive, judicial and legislative officers, and from this it may be inferred that it *is* a duty "enjoined by law."

This, now, brings us back to the first proposition, and that is, have the petitioners a "legal right," to insist that these returns shall be certified to the secretary of State?

As an evidence of their right to have this done, the petitioners aver that they were candidates for election as members of the House of Representatives of the General Assembly of the State of Arkansas, and that, if a proper return is made by the clerk of the county of Pulaski, it will appear to the secretary of State that they are entitled to seats in the House of Representatives.

The 34th section of the election law says: "It shall be the duty of the secretary of State, on the first day of each regular session of the General Assembly, to lay before each house a list of the members elected, agreeable to the returns in his office."

It seems to us that these facts, undenied as they are, give

the petitioners a "legal right," to insist that the clerk shall forward proper returns to the office of the secretary of State.

These things having been determined, it follows that this court has jurisdiction "to hear and determine the matters complained of."

.The counsel for the respondent urge that the determination of these facts is an interference with the legislative branch of the government, who are alone authorized to determine the election returns and qualification of its own members.

We are determining no such thing.   We are simply determining that the petitioners have made such a showing of a "legal right," as would authorize them to come into this court and ask it to compel the clerk of the Pulaski county court to send up proper returns to the secretary of State.   If the Legislature had no power to go behind the list of members furnished by the secretary of State to each house, it might with some propriety be asserted that this court would be determining the election of members of the General Assembly; but in this proceeding this court does not, nor is it asked to, say who are members of the House of Representatives, or who are not.

If the proper returns in the office of the clerk of the county show that the petitioners are elected, they have a right to have the returns forwarded to the secretary of State, that shows such fact to exist, no matter whether it may be true in point of fact or not.

There is a vast difference between saying that returns showing an election of certain persons shall be forwarded to the secretary of State, and saying that such persons are elected.

We will now turn to the second cause of demurrer, which is, that "the petition does not set forth facts sufficient to entitle the petitioners to the relief asked, or any other relief."

The relief asked, to bring it down to a single proposition, is to compel McDiarmid to send an abstract to the secretary of State, showing the vote cast for the different candidates as members to the House of Representatives of the General As-

sembly, in the different townships and wards within the county of Pulaski.

The response of McDiarmid says he has done this.

The petitioners file a supplemental answer, in which they say that it is true he has forwarded a return of all the votes cast in said county for members of the General Assembly, but that the return of the votes cast in the townships of Caroline, Clear Lake, Prairie and Richwoods, are certified as "votes cast for representatives in the lower house of the Arkansas State Legislature, in the territory belonging to the county of Prairie, in the twelfth district," instead of votes cast in the territory of Pulaski county, in the tenth district.

They further state that in the township of Eagle, and in the first and second wards of the city of Little Rock, in said county, the returns filed in the secretary of State's office, by the said county clerk, show that two elections were held on the same day within said township of Eagle, and said first and third wards of the city of Little Rock; and that instead of certifying the election returns of the election held by the judges of election appointed by the board of registration, that said McDiarmid has also forwarded the returns of other pretended elections, held in said township, and that by reason of doing so, the secretary of State is unable to tell who was elected according to the returns.

The demurrer of the respondent admits these things to be true, and this brings us to consider what was the duty of the clerk, under the law, in making out the returns.

It appears that double elections were not held in any of the townships of the county, save Eagle, and that double elections were only held in the first and third wards in the city of Little Rock. Under such circumstances, what was the duty of the clerk?

The 39th section of the election law is, "that on the fifth day after the election, if all the returns have been received, the county clerk shall proceed to open and compare the several

election returns which have been made to his office, and make abstracts of the votes given for the several candidates," etc.

As to all the other townships, save Caroline, Richwoods, Clear Lake, Prairie and Eagle, and the first and third wards of the city of Little Rock, his duty was clear and plain; for it was no part of his business to determine whether the election held in Ashley, Eastman, Campbell, Gray and Badgett precincts was regular or not.   There was but one set of returns before him, and he was bound to forward an abstract, to the secretary of State, of those townships.

Now, let us see what his duty was, as to the township of Eagle, and the first and third wards of the city of Little Rock.

There were two sets of returns filed in his office, and counsel ask how was the clerk to determine which was the legitimate return?

The third section of the election act requires the county court to revise the formation of election precincts in each county, and fix a place in each precinct or ward, where the election shall be held.   The county clerk is the custodian of the records of the county court, and it will be presumed that he knew the action of the county court in this respect.

The fourth section of said act requires the board of registration, for each county, immediately before the election, to appoint three discreet persons, having the qualification of electors, in each election district, to act as judges of election.   The petition alleges, and the demurrer admits, that a list of the judges, appointed by the board of registration, was filed in the office of the county clerk, and that he knew who the regular judges were.

Knowing that the law authorized the appointment of judges of election by the board of registration, and being furnished with the evidence of such appointment, now what was the duty of the county clerk?

The counsel for the respondent, at this point, direct our attention to the seventh section of the election law, which provides that, "If the county court shall fail to fix a place at

which elections are to be held in any election district, *or the board of registration fails to appoint judges of election*, or those appointed *fail to act*, it shall be the duty of the sheriff to fix a place for holding the election, and the voters, when assembled, may appoint the judges." After directing our attention to this section, it is asked how the clerk is to know whether the return made by persons as judges elected by the voters, is the regular return of the election held, or whether that held by the regularly appointed judges should prevail?

The answer is, that it appears that '*the board of registration did not fail to appoint*," and the evidence that the regular judges did not "*fail to act*," is furnished by the returns filed in the office of the county clerk, and that the law does not recognize the right of the voters to select judges, except in the two cases provided.

But it is urged that the returns from the township of Eagle, and the first and third wards of the city of Little Rock are sworn to, and that it appears therefrom, that the regular judges did "*fail to act*," and it is asked what the clerk is to do under such circumstances?

We have already stated that return of the regularly appointed judges was made to the clerk; it was to be presumed that they had acted, if they so returned; and as to whether what is termed the "irregular polls," were so sworn to, all that we have to say is, that no such fact appears by the response or demurrer, and such statements must be treated *de hors* the record.

Then, we say, that the returns made by the judges appointed by the board of registration, and of which the clerk admits he was fully advised, ought to have been certified as the true returns, and the other should have been excluded from the abstract to the secretary of State.

The counsel for respondent direct our attention to the 41st section of the election law, to show that, if the clerk should reject or refuse to count the vote on *any* poll-book, of any election held by the people, the clerk is liable to indictment for a

high misdemeanor, etc., and that it was his duty to certify, to the secretary of State, all the returns that might be returned to his office, whether legal or illegal.

It will be a sufficient response to this to say, that the law does not contemplate any such thing as an "illegal poll;" and when the law speaks of "*any poll-book,*" it has reference to the poll-book of a legal election, and not to the poll-book of an election that the *record,* in the office of the clerk of the county, advised him were *prima facie* void.

The records in the clerk's office, as the respondent admits, contained the names of the judges of election, appointed by the board of registration, and the return of the judges, that they held an election under and by virtue of that appointment, became another record, showing that they had *acted,* and under such circumstances the clerk had no right to assume that they had "*failed* to act," no matter who or how many had sworn they had not.

Having disposed of the township of Eagle and the first and third wards of the city of Little Rock, we will now proceed to inquire, the clerk's duty, as to the townships of Caroline, Clear Lake, Richwoods and Prairie.

The counsel for McDiarmid urge, that the electors residing in the territory acquired from Prairie county, although electors of Pulaski county for the purpose of electing members of Congress, State and county officers, are not electors of the tenth senatorial district, and have no right to vote therein, they having been electors of the twelfth senatorial district at the adoption of the present Constitution.

In assuming this position, they urge that they are sustained therein by the plain provisions of the Constitution of this State.

The provision of the Constitution alluded to reads as follows: "Until after the apportionment, as herein provided for, the senatorial and representative districts shall be composed of the following counties, to-wit: * * * Tenth district, of

Pulaski and White; twelfth district, of Prairie and Arkansas."

Here we have an apportionment of the *counties* into senatorial and representative districts.

The concluding portion of the section declares that, "the senators and representatives shall be apportioned among the several senatorial and representative districts as follows, to wit: Tenth district, two senators and six representatives; twelfth district, one senator and four representatives."

Here we have an apportionment of the number of senators and representatives to the different districts.

The 8th section, of article 5 of the Constitution, then declares that "there shall be no apportionment, other than that made in this Constitution, until after the enumeration to be made in the year one thousand eight hundred and seventy-five."

Here we have a declaration that the apportionment made by section 2, of article 15, shall remain as it now is until after the year 1875.

The inquiry now arises, does the act, entitled "An act to be entitled an act to change the boundary lines of Prairie and Monroe counties, and for other purposes," change any one of the senatorial or representative districts, or the basis of representation or apportionment therein?

The Constitution declares that the tenth district shall be composed of the counties of White and Pulaski, and that the district shall have two senators and six representatives.

The counsel for the respondent urge that these provisions of the Constitution evidence an intention on the part of the framers of the Constitution, and the people who adopted it, to prevent the transfer of electors, by change of county lines, from one senatorial and representative district to another. We do not assent to any such interpretation of the Constitution.

Section 12, of article 50, declares that "no county now established by law shall ever be reduced, by the establishment of any new county or counties, to less than six hundred square miles."

The rule of construction is, that the Legislature may pass all such laws as to them may seem just, so long as they do not *trench* on the other departments of government, or the Constitution of the State. The inhibition in the section just quoted is, that counties shall not be reduced below six hundred square miles. This does not prevent the Legislature from adding territory to another county, so long as it does not reduce a county below the number of square miles mentioned in the Constitution.

This general proposition is conceded by counsel for respondents, but they insist that, while it is true the Legislature may change the boundaries of counties, it cannot change the boundary of a senatorial or representative district.

We concede that the Legislature had no power to attach a portion of Prairie county to the tenth district for the sole purpose of allowing the electors of the twelfth district to vote in the tenth, without a change of county boundary. This would be a mere change of voters. But, in this instance, the county line is changed and the citizens are, by operation of law, moved from one county to the other for *all* purposes, as fully as though they had abandoned their former homes and moved voluntarily within the county of Pulaski. They then as much become electors of the tenth district as they were of the twelfth.

The boundary line of the tenth district is fixed by the boundary lines of White and Pulaski counties, and not by what was the boundary of those counties at the adoption of the Constitution. To say that the electors of Prairie county may be transferred, by a change of county boundary, into Pulaski county, for the purpose of suing and being sued, for the purpose of voting for all State and county officers and members of Congress, and that they cannot vote for senators and representatives to be elected to represent the county in which they live and are interested, but that they must vote for men to represent them in the Legislature that do not live in their

counties, is a proposition that, when once stated, shows the fallacy of the reasoning.

The tenth senatorial district is yet composed of the counties of White and Pulaski, and no other. The ·officers of Prairie county have no jurisdiction over a single foot of the territory added to Pulaski. county. In making the apportionment the framers of the Constitution evidently intended that the boundary lines of the different counties, and not the boundary lines of the different townships of a county, should constitute the boundary lines of the senatorial and. representative districts. The inhibition in the Constitution, in relation to apportionment, was to prevent the Legislature from changing the *counties* in the district—that is, from taking one *county* out of a district and placing another therein. If the Legislature should put White county into some other district, and Prairie into the tenth district, this would be such a change of apportionment of the district as the Constitution inhibits; or if the Legislature attempted to say that the tenth district should have one senator and four representatives, instead of two senators and six representatives, as now fixed by the Constitution, this would be such a change in the apportionment as the provision was intended to inhibit.

These things being true, the clerk of the county court ought to have returned the abstract of votes cast in these townships, as votes cast in Pulaski county, instead of votes cast in the county of Prairie, in the twelfth senatorial district. Whether the electors of those townships had a right to vote in Pulaski county for senators and representatives to represent the tenth district, was a question that the law does not authorize a county clerk to decide. His duty is simply ministerial, and it was for him to certify the returns, and let the proper tribunal pass on the question of legality or illegality.

It is urged that *mandamus* is not the proper remedy, if the party can obtain justice by any other proceeding, and the case of " *The People v. The Supervisors of Greene, 12 Barb. 222,* is cited as an authority in point, in which case the writ was re-

fused on the ground that it would be "inappropriate and ineffectual." There is no analogy between that case and the one now before the court. In the case cited the *mandamus* was prayed for the purpose of convening a board of supervisors to meet and re-count certain votes, and the court refused the *mandamus* on the ground that the board was *functus officio,* and if convened, would have no legal authority to do the act prayed by the petitioner.

The county clerk is not *functus officio,* and, being a "public officer," can be compelled to perform any duty which, by law, he is required to do, if the person asking it shows any legal right to have it done.

Other authorities have been cited to show that the sending of the abstracts forward, as prayed by the petitioners, would not establish them in their rights; and from this it is urged that the remedy is not efficacious, but on the contrary fruitless, and for this reason ought to be dismissed.

It appears to us counsel for respondent have mistaken the object of this proceeding. Its object is not to determine that the petitioners are entitled to seats in the House of Representatives, but to compel the county clerk to send such abstracts of the election to the secretary of State, as will enable him to put the persons names on the list to be made out by him, and furnished to the different houses, as appear to be elected by the returns properly certified to his office.

The amended petition sets up that the returns certified to the secretary of State are not returns responsive to the prayer of the petitioners. The prayer is that McDiarmid be compelled to send an abstract of the votes cast in the township of Eagle and in the first and third wards of the city of Little Rock, of the election held by the judges appointed by the board of registration, and an abstract of all other returns or pretended returns of said election presented to him, or on file in his office.

In order to have complied with this prayer of the original

petition, and that of the amended or supplemental petition, he must have sent to the secretary of State an abstsact, "on a separate sheet of paper," showing the number of votes each candidate received in the townships of Gray, Maumelle, Owen, Fourche, Big Rock, Campbell, Union, Badgett, Eastman, Clear Lake, Richwoods, Ashley, Prairie, Caroline, Peyatte, Plant, Cypress, Bayou Meto, Mineral, Eagle and of the first, second, third and fourth wards of the city of Little Rock. An abstract had been sent to the secretary of State, it is true, showing a portion of the returns required by the abstract asked by the petitioners, but as to the township of Eagle, and the first and third wards of the city of Little Rock, it showed the votes cast at an illegal, instead of the legal poll. As to the townships of Prairie, Richwoods, Clear Lake and Caroline, the abstract sent to the secretary of State showed that the votes of those townships belonged to the twelfth, instead of the tenth district.

The response does not show the sending forward of the abstract asked by the petitioners, and which we think they are entitled to upon the showing made to the court.

The demurrer is overruled, and the writ prayed for will be awarded, unless the clerk can make a response that is responsive to the prayer of the petition.

[The demurrer to the petition being overruled, and the respondent having filed an amended response, the court delivered the following opinion thereon.]

McClure, J.

The response admits the appointment of the judges of election, as alleged by the petitioners, save as to the township of Eastman, and denies that the judges, so appointed by the board of registration, were legal judges, on the ground that a list of the judges, so appointed as aforesaid, was not filed in his office until three o'clock, P. M., on Saturday preceding the election.

It is a sufficient answer to this to say, that the law does not

fix the precise length of time the list shall be filed in the clerk's office before the election. The response shows it to have been filed on the Saturday before the election, which evidences the fact that, so far as the clerk is concerned, he knew who the judges of election, appointed by the board of registration, were. Whether the judges thus appointed were legal judges, is a question the clerk had no power to decide, nor can *he* question the validity of their appointment in this proceeding.

The response states, that the clerk had no information as to armed mobs seizing and usurping the polls, and preventing the judges appointed by the board of registration from acting. This denial, it is presumed, is intended to refer to the poll-books of the townships of Ashley, Campbell, Gray, Badgett and Eastman.

In the opinion delivered on yesterday, we said, that inasmuch as but one set of poll-books came up from those townships, the clerk was bound to presume in favor of their correctness, and certify them to the secretary of State.

As to the township of Eagle, and the first and third wards of Little Rock, the response says but *one* set of poll-books were returned into his office, and that said returns show that the judges appointed by the board of registration had failed to open the polls in the time prescribed by law; all of which the clerk says will appear by reference to exhibits.

By reference to these exhibits we find what purports to be a copy of a letter written, which is not even certified to as being a correct copy of a letter on file in the clerk's office, by persons who sign themselves as deputy sheriffs, wherein the clerk is informed that at the hour of eight o'clock, the time fixed by law for opening the polls, there being no judges of election present, certain persons therein named were selected as judges of election.

The response admits the return of the election returns held by the judges of election, appointed by the board of registration, in the township of Eagle, and the first and

third wards of the city of Little Rock, but says on account of "official information and satisfactory indubitable testimony," he certified the election returns of the election held by the judges elected by the people, to the secretary of State.

The only information the clerk seems to have had, as to the failure of the regular judges to act, was the letter purporting to have been received from some person signing himself deputy sheriff, and this constituted the "official information and indubitable testimony" on which he based his action.

In our opinion, this is not sufficient to overturn the returns of the regular judges, who made a return, showing they had acted. And, even if it did raise a question in the mind of the clerk, he has no authority or power to decide it. His duty was to presume in favor of the regularity of the action of the persons who were appointed, in the manner prescribed by law, to perform the act of holding the election. The law makes it no part of the duty of deputy sheriffs to write such letters, and, in the absence of such a provision of the law, the deputy sheriff's letters are entitled to no more credence than those of any other citizen of the State.

Judges of election, by the provisions of the sixth section of the election law, continue to be judges of election until the next general election; and in every case where an election is held by persons other than the regular judges, *the poll-book itself* ought to show the absence of the regular judges, or some reason why the regular judges did not act. In cases where a special judge is elected, the record always shows that the election was made because the regular judge did not appear, or that he was in some manner disqualified by some provision of the law, and there is no good reason why persons not known to the law, as judges of election, should be excused from showing by what authority they have assumed to discharge duties enjoined upon another. A *letter* from a deputy sheriff, directed to this court, informing it that the regular judge failed to appear, as the law provides, and that the bar elected a judge,

would hardly supply the deficit in a record, nor would it show any authority in the judge to hear and determine cases.

The object of this *mandamus*, and its prayer is, that the clerk of Pulaski county make out an abstract showing the number of votes cast at the election, held on the 8th day of November, 1870, for persons voted for for representatives in the General Assembly of the State of Arkansas, whereon will be shown the whole number of votes cast, according to the returns on file in the county clerk's office, for each candidate in the townships of Eastman, Clear Lake, Richwoods, Ashley, Gray, Prairie, Caroline, Peyatte, Plant, Cypress, Bayou Meto, Mineral, Maumelle, Owen, Fourche, Big Rock, Union, Campbell, Badgett, and the second and fourth wards of the city of Little Rock, and whereon will be shown the vote cast at the election held by the judges of election, *appointed by the board of registration*, in the township of Eagle, and the first and third wards of the city of Little Rock.

It is no response to say, that the clerk has certified certain townships already.   What the petitioners want, is an *abstract* showing the information prayed for, and, to use the exact expression of the law, "on a separate sheet of paper."

The peremptory writ is awarded, and the clerk of this court will issue it forthwith.


GREGG, J., dissenting, says:


The plaintiffs bring their original petition, in this court, praying for a *mandamus* against the defendant, as clerk of Pulaski county, to compel him to certify what they allege to be the proper abstracts of election returns of said county, of the election held the 8th of November, 1870, and to file the returns, so certified, with the secretary of State.

The defendant responds that, before the filing of this petition against him, he did make and file abstracts and statements of all the votes cast at said election, etc., and of all returns, or pretended returns of said election, presented or filed in his

office, and returned and certified the same, and filed them with the secretary of State; and by a demurrer clause in his response, he submitted that this court had no jurisdiction in this suit, and that we should not take jurisdiction of the matter.

Upon the latter proposition, we have been unable to find any sufficient reason to change our views from the opinion expressed by the minority of the court, in the case of Price & Barton against Page, as treasurer. Our understanding of the Constitution of our State, and the whole theory of our judicial system, convinces us that the Supreme Court of the State was, and is, intended as a tribunal of last resort; that its leading object and intent was, and is, the hearing of appeals and the correction of errors; the holding of general supervision and control over inferior tribunals, and that it is not the intent and spirit of the Constitution, and was not the design of its framers, that this should be a court of first impression; that writs of this and a similar character should not be originally issued, and heard, and determined in this court; that, if so, no revisory power anywhere exists to correct the errors likely to be often intermixed in the haste of original trials. But, in this case, we will content ourself with these few general remarks on this subject, without quoting the various provisions in our Constitution that have led us to this conclusion, and giving, at length, the cogent reasons why the people, in convention, should have intended, and did intend, that the Constitution be interpreted as we understand it.

The other question raised by the demurrer is, whether the case presented here, is a proper subject for judicial investigation in this court. We also assume the negative of this position. Our State Constitution, in reference to the Legislature, *Sec. 4, Art. 5,* declares that: "each house shall choose its own officers, determine the rules of its proceedings, judge of the qualifications, election and return of its members," etc.

To our mind, it is clear that the object intended to be accomplished by this clause was, to commit the whole subject of the election and qualification of members to that house, in

which membership is claimed, for consideration and determination; and that no co-ordinate department of government was expected to influence or control them in their action.

The majority of the court admit that the legislative branch of the government alone is authorized to judge of the election, return and qualification of its members; but, they say, we are only asked, herein, to compel the clerk of Pulaski county court to send up to the secretary of State proper returns. Now if we can, under this Constitution, judge as to what are proper returns, and compel the clerk to make out such returns, can we not judge, also, as to the election or qualification of the members? The Constitution declares each house shall judge of the qualification, election and *return* of its members. Now, if we can disregard that clause in this Constitution, that declares that the house shall judge of *the return*, can we not, also, disregard that, which says it shall judge of the election and qualification of its members? Wherein is the difference? If we assume one function belonging to another department, can we not assume others? And, if we do this, are we not assuming a power that is given to a co-ordinate department, and not granted to us?

In *section 556*, "*Law and Practice of Legislative Assemblies*," *by Cushing, p. 225*, the law is stated as follows: "It being a principle of parliamentary law that a legislative assembly is the sole and exclusive judge of the *returns* and elections of its own members, it follows that the validity of an election, or return, cannot be drawn into question, on a claim of privilege, for, otherwise, the independence of the Assembly would be placed completely at the discretion and in the power of other co-ordinate branches of the government," etc. The law here declares that the *return* and *election* of members is within the sole and exclusive control of the Assembly. No distinction is here made by which a court can judge of the returns, and leave the house to judge of the elections alone. This writer declares that the election, *or return*, cannot be drawn in question, etc. Not election *and return*, but *or return*, etc.; other-

wise the independence of the Assembly would be placed completely at the discretion of other co-ordinate branches of the government, etc. It is to maintain this distinctiveness, and keep the one department of government free from the interference and control of the others, that our Constitution has so expressly and carefully conferred these powers upon the respective houses of the General Assembly; and, as Mr. Cushing says, "given them the sole and exclusive control over the election and return of its members."

In England the returns were made and returned into chancery (while here they are made to the secretary of State,) and there recorded, and this return and record was the evidence of a member's right to his seat, and in the work referred to, *sec. 1050*, this author says: "But as this record is made up from the returns in the first instance, and as they are received, which cannot be altered *but by the authority of the house*, and as the house, which is the sole judge of the returns and election of its members, may, afterwards, upon investigation, find that a particular return is wrong, and that some other person should have been returned: it then becomes necessary, by analogy, to legal proceedings in certain cases, that the record should be made to conform to the facts. Inasmuch, however, as the record is in the chancery, and the power to rectify it exists only in the house, the method of proceeding is for the house to direct the returning officers, if necessary, and the clerk of the crown, in chancery, to attend in the house and there, in its presence, to make the requisite alterations." *Sec. 1051.*

"These officers may, also, be directed to perform other official acts connected with the election and return of members, and are subject to the censure and punishment of the house for any neglect of duty," etc. Nothing is here said of the returning officers being amenable to the courts, but it is said *the house* may punish, and it is here said, as to this return and record made in the crown office in chancery (with us in the office of the secretary of State,) "*The power to rectify it exists only in the house,*" etc., while, in the matter before the court we are urged

to have the returns corrected, that the secretary may correct his records or lists and certify accordingly. But again, in *sec. 140*, this author says: "As to the general duty of returning officers, it has been a point much agitated in England, whether it is wholly ministerial, or whether it is in any degree judicial." In reference to this question, the writer already referred to, remarks: "There can be no doubt that in those branches of their duty, wherein the law has marked out a definite line, it is ministerial, etc.,   *   *   *   In the judicial decisions of this country, where this point is adverted to, it seems to be considered that the returning officers are chiefly judicial in their character," etc.  *Sec. 141.*

"It remains to be observed, in conclusion, that the proceedings of these officers, from the necessity of the case, are, in the first instance, uncontrollable by any other authority whatever; so that if, on the one hand, notwithstanding an election has been effected, the returning officers refuse or neglect to make the proper return, the party thereby injured is without remedy or redress until the assembly, to which he is chosen, has examined his case and adjudged him to be duly elected; and, on the other hand, if the returning officers make a return when no election has, in fact, taken place, or if not eligible, the person returned, will not only be entitled, but it is his duty to assume and discharge the functions of a member until return and election are adjudged void."

I have thus quoted at some length from this standard author, to show that the return, as well as the election of members, is solely under the control of the legislative department, and, as stated, the Constitution contemplates that it shall be entirely free from the influence or control of the judiciary and executive departments of the government, and that this may be placed beyond all question, the returning officers of elections are, by this law, declared to be beyond their control; and if, through the misconduct of such officer, a person is injured, as stated in the last paragraph quoted, he is, from the very necessity of the case, without remedy until the assembly meets.

That is the court provided by the Constitution to try such case, and he must wait until it convenes, and therein have his rights determined. Yet it is assumed here that we will control the returning officer and cause him to make a return different from what, in his judgment, he should make, and thereby change the rights of contestants, while the authority referred to is, that these officers are uncontrollable by the courts. This is a special matter, by the Constitution made triable by the legislative department, and intended and provided for the maintenance of the rights, dignity and independence of that department. And, in our opinion, the writ prayed for should be denied and the petition dismissed.

HARRISON, J., dissenting, says:

Adhering to the opinion I expressed in the case of *Price & Barton v. Page, Treasurer*, that this court has no original jurisdiction except in the exercise of its superintending control over inferior tribunals, I think we should not take cognizance of this case. I concur, however, with the majority of the court, in the conclusions at which they have arrived, in respect to the other questions involved in the case.